PD No. _____

# IN THE COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

| | | |
|---|---|---|
| **JEREMY PAUL THORNBURG,** | § | |
| **Appellant** | § | |
| | § | **CAUSE NO. 03-13-00049-CR** |
| **V.** | § | |
| | § | **TRIAL COURT NO. 8931** |
| **THE STATE OF TEXAS,** | § | |
| **Appellee** | § | |

## PETITION FOR DISCRETIONARY REVEW
## FROM THE SECOND COURT OF APPEALS
## AT FORT WORTH, TEXAS

## CHIEF JUSTICE TERRIE LIVINGSTON, PRESIDING

## PETITION OF PETITIONER (APPELLANT)

**COPELAND LAW FIRM**
**PO Box 399**
**Cedar Park, Texas 78613**
**Tel. 512-897-8196**
**Fax. 512-215-8144**

**TIM COPELAND**
**State Bar No. 04801500**
**Attorney for Appellant**

RECEIVED IN
COURT OF CRIMINAL APPEALS

September 14, 2015

ABEL ACOSTA, CLERK

# TABLE OF CONTENTS

**Page**

**Table of Contents**    *i-iii*

**Index of Authorities**    *iv*

**I.**    **Identity of Trial Court and Parties**    **1**

**II.**    **Statement Regarding Oral Argument**    **2**

**III.**    **Statement of the Case**    **3**

**IV.**    **Statement of the Procedural History of the Case**    **4**

**V.**    **Ground for Review**    **4**

Did the Court of Appeals err in disregarding as "harmless error" the admission of an expert's opinion that he found the victim's DNA derived from a "bloodstain" on appellant's gun when there was no evidence, absent appellant's extrajudicial admission, for the factfinder to conclude with any degree of certainty that the victim had been shot to death? *See* R.R. 8, pp. 37, *et. seq.* and specifically at 40, 50, 52, and 61; and, ***Jordan v. State***, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996) (standard for relevance is whether the scientific principles will "assist the trier of fact" and are "sufficiently tied" to the pertinent facts of the case); ***Solomon v. State***, 49 S.W.3d 356, 355 (Tex. Crim. App. 2001) (error does not affect a substantial right if we have a "fair assurance that the error did not influence the jury, or had but a slight effect").

**VI.-VII.**    **Summary of the Argument/Background**

**VIII.**    **Statement of Pertinent Evidence**    **7**

**IX.**    **Court of Appeals' Decision**    **8**

*i*

# TABLE OF CONTENTS, continued

Page

X.   **Argument**                                                                          9

    a.  The Court of Appeals erred in deciding that it need not address the issue of admissibility of a forensic examiner's testimony because the offending evidence played a substantial role in Thornburg's conviction.

        i.   There was no evidence, absent Thornburg's extrajudicial admission, for the factfinder to conclude that Shields had been shot to death.

        ii.   Speculative opinion that the victim's DNA was derived from a tiny droplet of *blood* found on a gun, when that opinion was derived only from a "presumptive test" for the presence of blood without statistical tests in the scientific community to determine the statistical accuracy of that presumptive test, was devastatingly prejudicial to Thornburg's case.

    b.   Admission of the complained of evidence was not "harmless" despite the appellate court's determination to that effect.

        i.   The "blood" evidence was the only forensic evidence used to link the victim to Thornburg.

        ii.   The gun and "blood" evidence was the linchpin to the State's argument that Shields had been murdered at Thornburg's hand.

*ii*

**TABLE OF CONTENTS, continued**

Page

iii. The Court of Appeals, while dismissive of the importance of the evidence in its sufficiency review, nevertheless identified the complained of forensic evidence as the concluding reason for rejecting an insufficiency claim, the final nail in the coffin, so to speak.

XI. **Prayer** 11

XII. **Certificate of Service and of Compliance with Compliance with Rule 9** 12

# INDEX OF AUTHORITIES

**Page**

## Texas Courts of Criminal Appeals cases

*Jordan v. State*
    928 SW2d 550 (Tex. Crim. App. 1996)    4,**9**

*Solomon v. State*    **4**
    49 S.W.3d 356, 355 (Tex. Crim. App. 2001)

## Statutes

**TEX. PENAL CODE §19.02(b)(1)**    **3**

**TEX. R. EVID. 403**    **9**

# I. IDENTITY OF TRIAL COURT AND PARTIES

**TO THE COURT OF CRIMINAL APPEALS:**

**NOW COMES** Jeremy Paul Thornburg, appellant, who would show the Court that the trial court and interested parties herein are as follows:

**HON. STEPHEN BRISTOW**, Judge Presiding, 90th Judicial District Court, Young County, Texas.

**JEREMY PAUL THORNBURG**, appellant, TDCJ No. 01957650, Connally Unit, 899 FM 632, Kenedy, Texas 78119.

**REGINALD WILSON** and **MARK BARBER**, trial attorneys for appellant, 813 Eighth St., Ste. 920, Wichita Falls, Texas 76301 and 900 Eighth St., Ste. 116, Wichita Falls, 76301 respectively.

**TIM COPELAND**, appellate attorney for appellant, P.O. Box 399, Cedar Park, Texas 78613.

**DEE PEAVY** and **RYAN CONWAY**, District Attorney and Assistant District Attorney, respectively, trial and appellate attorneys for appellee, the State of Texas, 516 4th St., Ste. 206, Graham, Texas 76450.

## II.  STATEMENT REGARDING ORAL ARGUMENT

Appellant believes the clarity of the issue in this case is such that oral argument would add nothing.

# IN THE COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

| | | |
|---|---|---|
| **JEREMY PAUL THORNBURG,** | § | |
| Appellant | § | |
| | § | **CAUSE NO. 03-13-00049-CR** |
| **V.** | § | |
| | § | **TRIAL COURT NO. 8931** |
| **THE STATE OF TEXAS,** | § | |
| Appellee | § | |

## PETITION FOR DISCRETIONARY REVEW
## FROM THE SECOND COURT OF APPEALS
## AT FORT WORTH, TEXAS

## CHIEF JUSTICE TERRIE LIVINGSTON, PRESIDING

**TO THE HONORABLE COURT OF CRIMINAL APPEALS OF TEXAS**:

## III.  STATEMENT OF THE CASE

A jury found Jeremy Paul Thornburg guilty of the murder of his former girlfriend, Candice Shields, and assessed punishment at life imprisonment. (*See* **TEX. PENAL CODE §19.02(b)(1)** and R.R. 9 and 10, pp. 64 and 44, respectively.

## IV. STATEMENT OF THE PROCEDURAL HISTORY OF THE CASE

The Second Court of Appeals at Fort Worth, Texas, by Memorandum Opinion dated August 6, 2015, affirmed Thornburg's conviction and sentence. A copy of that opinion is hereto attached as if fully incorporated herein at length.

## V. GROUND FOR REVIEW

Did the Court of Appeals err in disregarding as "harmless error" the admission of an expert's opinion that he found the victim's DNA derived from a "bloodstain" on appellant's gun when there was no evidence, absent appellant's extrajudicial admission, for the factfinder to conclude with any degree of certainty that the victim had been shot to death? *See* R.R. 8, pp. 37, *et. seq.* and specifically at 40, 50, 52, and 61, and ***Jordan v. State***, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996) (standard for relevance is whether the scientific principles will "assist the trier of fact" and are "sufficiently tied" to the pertinent facts of the case); ***Solomon v. State***, 49 S.W.3d 356, 355 (Tex. Crim. App. 2001) (error does not affect a substantial right if we have a "fair assurance that the error did not influence the jury, or had but a slight effect").

## VI. SUMMARY OF THE ARGUMENT

The Court of Appeals sustained the trial court's admission of an expert's opinion that a stain found on Thornburg's gun, from which the expert derived a DNA sample, was a bloodstain even though his conclusion was derived only from a "presumptive" test for blood unsupported by statistical evidence to support that conclusion. The Court of Appeals then compounded its error when it "disregarded the error, if one occurred," as harmless in light of the evidence as a whole. The blood evidence served as the linchpin of the State's theory that Thornburg murdered the victim with a gun though the victim's body was never recovered and thus the cause of death, and even its occurrence, was circumstantial.

## VII. BACKGROUND

On the morning of December 11, 2011, Candice Shield went missing. Police interviewed the family the evening of December 12, 2011, and a massive search ensued in the weeks and months that followed. Despite their efforts, which included helicopters, four-wheelers and cadaver dogs and which covered untold miles of search area, Shields' body was never found. (R.R. 5, pp. 44-47 and R.R. 6, p.45, *et. seq.*).

Jeremy Thornburg came under suspicion in January, 2013, based on statements given by his girlfriend, Sarah Santiago, after she alleged he had assaulted

her during a domestic dispute. (R.R. 5, pp. 242, 245). While interviewing Santiago, a gun was recovered from Thornburg's bed. (R.R. 5, pp. 250-253). Santiago claimed that Thornburg had threatened her with the gun and had told her he would use the gun that he (had) killed Candice Shields with and "he would shoot [Santiago] just like he did her and get away with it." (R.R. 5, pp. 244-245). Aside from Santiago's statements and the recovery of a gun, the State also produced evidence it argued sufficiently proved the *corpus delicti* of murder, including:

- prior to December 10, 2011, Shields had called her mother daily, but her mother had not heard from Shields since her disappearance;

- personal items that she was never seen without—including her purse, cell phone, and makeup—were left in her bedroom;

- Thornburg communicated with Shields throughout the evening of December 10, 2011, and into the early morning hours of December 11, 2011;

- the bulk of the communications between Thornburg and Shields had been deleted from Shield's cell phone;

- Thornburg's cell phone records indicated that he had traveled east from Sweetwater in the middle of the night, despite not owning a car;

- around the time of Shield's disappearance, Thornburg's mother, with whom he lived, noticed that her car's gas tank was empty despite having filled it the day prior;

- the month before Shield's disappearance, Thornburg, and an accomplice witness, Long, a witness, had discussed killing Shields;

- a witness testified that he saw Long give Thornburg a bottle of bleach late on the night of December 10, 2011;

- when another witness noticed that the bleach she shared with Long was gone, she questioned Long, and Long said that she had given the bleach to Thornburg because he had killed Shields.

- finally, and most pertinent for purposes of this petition, a gun recovered from Thornburg's apartment contained a blood stain that, when tested for the presence of DNA, revealed that Shields could not be excluded as a contributor of the DNA and that the odds of a random match were one in 32.39 trillion. An expert opined that the stain was blood based solely upon a "presumptive" test for the presence of blood.

It is the Court of Appeals' ruling that admission of the last mentioned testimony from a forensic scientist, even if error, was harmless, which is the focus of this petition.

## VIII. STATEMENT OF PERTINENT EVIDENCE

Thornburg argued that the trial court abused its discretion by admitting testimony regarding an expert's opinion as to whether he had located blood on Thornburg's gun.

Brent Hester, a forensic scientist employed by DPS, testified that he had performed a presumptive test on two stains found on the underside of a gun recovered from Thornburg's house. He said that he had obtained a presumptive positive result for blood on one spot less than one millimeter in diameter, which was almost invisible to the naked eye. From that stain, Hester said that he had obtained a DNA sample that he had compared to Shields's DNA profile from her sex-offender registration requirements, as well as to a DNA sample from a biopsy slide that was maintained in Shield's medical records following an earlier gall bladder surgery. Based on those comparisons, Hester determined that the probability of selecting an unrelated person at random who could be the contributor to the DNA profile obtained from the stain on the gun was "approximately one in 32.39 trillion for Caucasians…." (R.R. 8, pp. 59-62).

Most importantly, based solely on his presumptive tests, Hester opined that the stains were "blood stains." (R.R. 8, pp. 37, *et. seq.* and specifically, at p. 52). After Thornburg's objection to that opinion was overruled, he admitted that without

statistical evidence backing the test, he could not say to a reasonable degree of certainty that the stain he observed on the gun was, in fact, a blood stain. (R.R. 8, p. 93).

## IX. COURT OF APPEALS' DECISION

The Court of Appeals did not determine whether the trial court erred by admitting the testimony regarding the expert's opinion as to whether he had located blood on Thornburg's gun. (*Slip op*. at 22). The Court of Appeals reached that conclusion because "even assuming that it was error, (…) any error was harmless." (*Slip op*. at 22). In making that determination, the appellate court wrote that, even excluding the testimony, "there was overwhelming evidence of Thornburg's guilt," and it pointed to the evidence detailed above. (*Slip op*. at 23). Thus, the appellate court "disregarded" the error, if one occurred. (*Slip op*. at 24).

## X. ARGUMENT

The Court of Appeals erred, first, in deciding that it need not address the issue of admissibility of the offending evidence because the evidence played a substantial part in Thornburg's conviction. Without the "blood stain" evidence supposedly found on the gun, the finding of Shields' DNA on Thornburg's gun was explicable. (For example, the gun was found on a bed he shared with a current girlfriend; he had previously shared a bed with Shields as well). Here, there was no evidence, absent

Thornburg's extrajudicial admissions, for the fact finder to conclude with any degree of certainty that Shields had been shot to death. Whether her DNA was found on Thornburg's gun in a bloodstain or not was thus irrelevant. In *Jordan v. State*, 928 SW2d 550 (Tex. Crim. App. 1996), the Court of Criminal Appeals judged the relevance of expert testimony by whether that testimony was of assistance to the trier of fact on a fact in issue. *Id*. at 556. Hester's opinion as to whether the stain was presumptively a bloodstain was not helpful in that regard because there was no evidence that Shield's was shot to death or that such a shot resulted in blood spatter.

Moreover, even if a review finds the described testimony relevant, "evidence may, under **Texas Rules of Evidence 403**, he excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." **TEX. R. EVID. 403**. Here, again, without consideration of Thornburg's extrajudicial admissions, the State speculated that the gun the source of Shields' DNA had been used to murder her without any other corroborating evidence that she had been shot to death. Absent such corroborating evidence, or indeed *any* evidence of how Shields' DNA came to be on the gun, or that she had been shot by the gun, the admission of Hester's speculative testimony that a tiny droplet of her blood had been found on the gun was devastatingly prejudicial to Thornburg's case. In fact, the State's theory that Thornburg murdered Shields with

the gun was not supported by any other reviewable evidence, and it was the linchpin of the State's argument that Shields had died at Thornburg's hand. Surely, the probative value of testimony that blood had been found on the gun, based solely on a speculative opinion unsupported by the literature of the scientific community, even of an expert, was outweighed by the prejudicial effect of such evidence where no one was able to say with any degree of certainty how the victim's blood, if it was blood, came to be on the gun.

The Court of Appeals writes that the offending forensic evidence was not necessary to the factfinder's determinations so the admission of the evidence constituted harmless error. However, that conclusion was reached after the Court of Appeals rejected Thornburg's sufficiency argument. The Court gives, as its concluding reason for rejecting the argument, the nail in the coffin so to speak, the complained of forensic evidence. Notably, and illustrative of the importance the evidence played in the case, though that testimony was not the last evidence presented by the State, it was the last piece of evidence cited by the Court of Appeals to justify dismissal of Thornburg's sufficiency claim. One could reasonably presume that the evidence was found equally damning by the factfinder at trial, and thus the Court of Appeals erred in its assessment of the effect of that evidence and in its determination that the admission of the testimony in question did not have    a

substantial or injurious effect on the jury's verdict and did not affect Thornburg's substantial rights.

## XI.  PRAYER

**WHEREFORE**, Mr. Thornburg prays that this Court reverse the judgment of the appellate court and enter an order remanding the case for consideration of the harmful effect of the erroneously admitted testimony.

<div style="margin-left: 40%;">

**COPELAND LAW FIRM**
P.O. Box 399
Cedar Park, TX 78613
Mobile/Text:  512.897.8196
Fax:  512.215.8114
Email:  tcopeland14@yahoo.com


By:     /s/  Tim Copeland
         Tim Copeland
         State Bar No. 04801500
         Attorney for Appellant

</div>

## XII.  CERTIFICATE OF SERVICE AND OF COMPLIANCE WITH RULE 9

This is to certify that on September 7, 2015, a true and correct copy of the above and foregoing document was served on the State Prosecuting Attorney, PO Box 12405, Capitol Station, Austin, TX 78711, and on Dee Peavy, District Attorney of Young County, 516 Fourth St., Rm. 201, Graham, Texas 76450, in accordance with the *Texas Rules of Appellate Procedure*, and that this Petition for Discretionary Review is in compliance with Rule 9 of the *Texas Rules of Appellate Procedure* and that portion which must be included under Rule 9.4(i)(1) contains 2226 words.

/s/ Tim Copeland
Tim Copeland

**Addendum**



# COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 02-14-00453-CR

| | | |
|---|---|---|
| Jeremy Paul Thornburg | § | From the 90th District Court |
| | § | of Young County (10123) |
| v. | § · | August 6, 2015 |
| | § | Opinion by Justice Walker |
| The State of Texas | § | (nfp) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By /s/ Sue Walker
    Justice Sue Walker



# COURT OF APPEALS
## SECO:ND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00453-CR

JEREMY PAUL THORNBURG                                    APPELLANT

## V.

THE STATE OF TEXAS                                       STATE

### FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY
### TRIAL COURT NO. 10123

## MEMORANDUM OPINION[1]

### I. INTRODUCTION

Appellant Jeremy Paul Thornburg appeals his conviction and life sentence

for the offense of murder. In four issues, Thornburg argues that the evidence is

insufficient to support his conviction, that the trial court erred by denying his

---

[1]See Tex. R. App. P. 47.4.

motion to suppress, and that the trial court abused its discretion by admitting the State's expert's testimony. We will affirm.

## II. FACTUAL 8ACKGROUND [2]

### A. Overview

On the morning of December 11, 2011, Johnny Salinas discovered that his grown granddaughter, Candice Shields, was missing from her bedroom when he went to wake her for work. At first, he assumed that she had left in the night to "party," but her phone was still on her bed; her purse and make up were still in the bedroom as well. As the morning wore on and Shields did not show up, Salinas grew increasingly worried. Eventually, Salinas hit redial on Shields's phone, and the call went to Shields's best friend, Missy Munn. Salinas explained his concerns to Munn, and she came to his house.

Later that morning, Shields's ex-boyfriend, Billy Wilson, joined Munn at Salinas's home, and because he had never seen Shields leave the house without her purse, cell phone, and make up-all of which were still in her bedroom-he called the Graham police. The police interviewed the family, and based on their conversations with the family, with Wilson, and with Munn, the police began treating Shields's disappearance as a missing-person case. Thereafter, in the ensuing weeks and months that followed, despite a massive search by law-

---

[2]Because the State notes in its brief that it is satisfied with the statement of facts set forth in Thornburg's brief, we set forth Thornburg's statement of facts with only a few additions and stylistic changes.

enforcement officials and civilian volunteers-which included helicopters, four-wheelers, and cadaver dogs and which covered untold miles of search area-Shields was never found.

### 8. Testimony Concerning Shields's Background

Shields grew up in Graham and was convicted of a sex crime as a juvenile; as a result, she was required to register as a sex offender. At age seventeen, Shields left her parents' home and moved in with Wilson and his family in Jermyn, Texas, and eventually had a child with Wilson. In the latter part of May 2011; Shields left Wilson and moved to Abilene to live with a man named Allen Faircloth. When Shields's relationship with Faircloth soured in the summer of 2011, she called Wilson to give her a ride back to Graham, and she moved in with Munn.

In October 2011, Shields moved in with her friends James and Misty Barnett. On the same day that Shields moved in, James Barnett's half-brother, Thornburg, also moved into the Barnetts' home. Within a short time after Shields met Thornburg, they began a romantic relationship, and within a couple of weeks, they announced that Shields was pregnant with Thornburg's baby.[3] Misty grew scared of Thornburg, and he and Shields were asked to move out of the Barnetts' home.

---

[3]Law enforcement was never able to find any medical documents confirming that Shields was pregnant; the only mention of this came from Thornburg and from other family members.

3

Because the couple had nowhere to go and because Thornburg was unemployed, he moved back into his mother and stepfather's home in Sweetwater; Shields moved into her grandparents' home in Graham and disappeared approximately ten days later.

Shields used to call her mother daily, but her mother had not heard from Shields since her disappearance.

### C. Testimony by Law-Enforcement Officials

#### 1. Lieutenant Jim Reeves

Lieutenant Jim Reeves of the Graham Police Department headed up the investigation into Shields's disappearance. Initially, he gathered information from her friends and family members, as well as contacts from Shields's cell phone. The data recovered from Shields's cell phone revealed that up until the day of her disappearance, Shields had almost daily communications with Wilson, Faircloth, Thornburg, and possibly other men.

Lieutenant Reeves testified that he called Texas Ranger Cory Lain to help with the investigation of Shields's disappearance and that they began a series of interviews to determine if anyone had ideas on where Shields might have gone. Lieutenant Reeves testified that Faircloth and Wilson had verified alibis for the night of Shields's disappearance.

When Lieutenant Reeves interviewed Thornburg by phone on December 15, 2011, Thornburg claimed that he had be_en in Sweetwater on the night that Shields had disappeared and that he did not have gas money to drive to Graham

4

on that night. Two weeks later, on December 29, 2011, Lieutenant Reeves and Ranger Lain drove to Sweetwater to interview Thornburg in person at the Sweetwater police station. Thornburg maintained that he did not know where Shields had gone.

Lieutenant Reeves detailed for the jury the extent of law enforcement's efforts to find Shields over the course of the following months wherever and whenever a lead developed.

### 2. Officer Lance Richburg

Thirteen months after Lieutenant Reeves and Ranger Lain interviewed Thornburg, Officer Lance Richburg with the Sweetwater Police Department met with Thornburg's ex-girlfriend, Sarah Santiago, on January 21, 2013, to take her statement on a domestic-violence allegation involving Thornburg. Santiago had called the police the night before and had alleged that Thornburg had assaulted her. Because Santiago was seven months' pregnant with Thornburg's baby, the police who responded to her 911 call advised her to go to the hospital and to wait until the following day to go to the police department to make a statement.

When she made her statement on January 21, 2013, Santiago said that she was scared of Thornburg because he had threatened to kill her and her unborn baby and to bury them in a field. Santiago said that Thornburg had told her that he had done it before and had gotten away with it.[4] Based on Santiago's

_____

[4]Santiago also testified at trial. She said that during an argument with Thornburg while she was five or six months' pregnant, he had head butted her,

5

statement, Officer Richburg called the Graham Police Department. Lieutenant Jim Reeves of the Graham Police Department responded that Thornburg was a person of interest in an unsolved disappearance in Young County.

After talking with Lieutenant Reeves, Officer Richburg and three other officers accompanied Santiago back to the apartment that she shared with Thornburg to effectuate a "civil standby" while Santiago gathered her personal belongings. Thornburg was home when the officers arrived, and Officer Richburg explained the nature of their visit and the police department's "civil standby" policy. Thornburg voiced no objections to the police officers' presence and waited outside the apartment while Santiago gathered her belongings, accompanied by Officer Richburg. When Santiago and Officer Richburg entered the couple's bedroom, Santiago pointed to a gun on the bed and said that Thornburg had used it to threaten her. Officer Richburg testified that he took the gun into evidence for the domestic-violence charge.

---

had pushed her to the ground, and had told her that "he would use the gun that he [had] killed Candice Shields with and he would shoot [Santiago] just like he did her and get away with it." Santiago testified that during this argument, the gun was on the bed, and he pointed to it. Several months prior to this, Thornburg had told Santiago that he had a missing girlfriend and explained that he was the reason she was missing; he said that he had taken his mother's car, that he had driven to Shields's grandparents' house, that he had convinced Shields to go with him, that he had driven to a remote area that was supposed to be romantic, that he had shot her in the face while they were walking, that he had shot her more times, .that he had poured bleach over her and had covered her with logs, and that this had all occurred around 3 a.m.

6

### 3. Additional Testimony from Lieutenant Reeves

Lieutenant Reeves served a search warrant on the Sweetwater Police Department and obtained the gun that Officer Richburg had recovered from the apartment that Thornburg shared with Santiago. Lieutenant Reeves later delivered the gun to Lubbock's Department of Public Safety crime Jab for analysis.

In response to Santiago's claims about Thornburg's threats to her, Lieutenant Reeves and Ranger Lain approached Santiago and asked her to make a clandestine telephone call to Thornburg.

### 4. Ranger Lain

On February 1, 2013, Ranger Lain and Lieutenant Reeves staged a controlled phone call between Santiago and Thornburg. During the approximately thirty-minute call, Santiago told Thornburg that she was afraid to move back in with him because she was "afraid [he] would hurt me like you hurt [Shields]." Despite telling Santiago that he did not feel comfortable talking about it over the phone, Thornburg stated, "I killed her because of me-she was going to make it so I couldn't see my daughter . . . ." Santiago asked Thornburg whether he might not kill her too **if** he got angry with her, and Thornburg answered, "I wouldn't get away with it for two girlfriends." A recording of the phone call was admitted into evidence and played for the jury.

Ranger Lain obtained cell phone records for Shields and Thornburg. Ranger Lain testified that the cell phone records revealed that Thornburg and

7

Shields had exchanged text messages and phone calls from 9:32 p.m. on December 10, 2011, until 12:45 a.m. on December 11, 2011, which was Shields's last text message *to* Thornburg. Thornburg called Shields's phone at 2:32 a.m. and 2:33 a.m.; approximately thirty minutes later, he called Shields's phone at 3:01 a.m. for forty-five seconds and at 3:02 a.m. for fifty-eight seconds. At 6:08 a.m. on December 11, 2011, Thornburg texted Shields, "I'm at home. I've been at home. Didn't have enough gas. I['m] sorry, Babe, that it took so long *to* text you back, but just know I love you and will text you when I get up." The bulk of the phone calls and text messages that were reflected in the cell phone records had been deleted from Shields's cell phone.

When Ranger Lain and Officer Reeves interviewed Thornburg on December 29, 2011, he said that the last time he had spoken to Shields was 2:33 a.m. on December 11, 2011, and that he had fallen asleep right after the 2:33 a.m. phone call. Based on the phone records, Ranger Lain testified that his theory was that Shields was deceased prior to Thornburg's calls *to* her cell phone at 3:01 a.m. and 3:02 a.m., that Thornburg had called Shields's phone *to* locate it, that he had found it, that he had deleted the text messages and phone calls, and that he had returned it to her grandparents' home in Graham before he returned to Sweetwater.

### 5. Brent Hester

Brent Hester, a forensic scientist employed by DPS, testified that he had performed a presumptive test on two stains found on the underside of the gun.

8

He said that he had obtained a presumptive positive result for blood on one spot less than one millimeter in diameter, which was almost invisible to the naked eye. From that stain, Hester said that he had obtained a DNA sample that he had compared to Shields's DNA profile from her sex-offender registration requirements, as well as to a DNA sample from a biopsy slide that was maintained in Shields's medical records following an earlier gall bladder surgery. Based on those comparisons, Hester determined that the probability of selecting an unrelated person at random who could be the contributor to the DNA profile obtained from the stain on the gun was "approximately one in 32.39 trillion for Caucasians . . . ."

### 6. Jeff Shaffer

Jeff Shaffer, who managed the United States Secret Service digital forensics lab, testified that he had conducted an analysis of the cell phone records of Thornburg, which Ranger Lain had obtained by subpoena. Shaffer testified that he had analyzed the system identification numbers (SIDs) associated with Thornburg's cell phone carrier reflected in the records as they related to Thornburg's use of his cell phone during the evening and early morning hours of December 10, 2011, and December 11, 2011. Shaffer said that the data indicated that Thornburg's cell phone location had moved from the SID covering the Abilene/Sweetwater geographic area to the SID covering the Vernon geographic area east of Abilene/Sweetwater. Shaffer testified that he could not necessarily say that Th.ornburg's cell phone indicated travel from Sweetwater to

9

Graham because he did not know the actual location of cell towers associated with the described SIDs. Shaffer said that he could say with certainty that Thornburg's cell phone had traveled generally "from one geographic area to another" west to east on the night in question.

### D. Accomplice-Witness Testimony

Lajuana Long. was another of Thornburg's girlfriends with whom he had a child. In her first interview with Lieutenant Reeves and Ranger Lain shortly after Shields's disappearance in 2011, Long told the officers that she worked with Shields at the Whataburger in Graham, but Long denied having any information about Shields's whereabouts. In her second interview following Thornburg's arrest in 2013, Long told law enforcement officials that she had heard that Shields had moved to Oklahoma in December 2011. After her third interview in March 2013 and after Ranger Lain told her that he thought she was lying, Long told Lain that she knew that Thornburg had murdered Shields and that she knew where her body could be found.[5]

Long testified at trial and said that she and Thornburg had lived together in Graham until September 2011, when he had begun a relationship with Shields. After Thornburg began dating Shields, Long said that she found out that Shields was a .registered sex offender and told Thornburg that she did not want their child

---

[5]Long described an area where she believed the body had been hidden as between Breckenridge and Graham, but after an exhaustive search for two days in the area that Long had described, the search in that location for Shields's body was abandoned.

around Shields. Long said that Thornburg began to talk about killing Shields. Long also said that Thornburg threatened to make Long "evaporate" if she tried to keep him from seeing their child.

Late in the day on December 10, 2011, Long said that Thornburg sent her a text that he was coming to Graham, where Long lived with Jessica Cortez, to see Shields. Long testified that she and Thornburg had previously discussed ways of disposing of Shields's body after watching television shows, and that on this occasion, Long asked her if she had any bleach. Late that night, Thornburg arrived at Cortez's mobile home. Long said that she took a half-full bottle of bleach and met Thornburg outside in the driveway. When she asked him whose car he was driving, Thornburg told Long that he had taken the car from his mother's home while she was sleeping. Long said that as they talked, she noticed a gun in the car. Long ultimately gave Thornburg the bleach, and he left. About an hour or two later, Thornburg called Long and told her that he had "[done] what he came to do" and that he was headed back home.[6] When Shields did not show up for work at Whataburger the next morning on December 11, 2011, Long said that she called Thornburg and asked him if he had really killed Shields; he told Long that he had.

_____

[6]Ranger Lain testified that the cell phone records reflected several communications between Thornburg and Long on the evening of December 10, 2011, and the early morning hours of December 11, 2011. Thornburg contacted Long at 1:20 a.m. and 2:19 a.m.; Long contacted Thornburg at 2:46 a.m. and 2:58 a.m.; and Thornburg contacted Long at 2:58 a.m., 3:57 a.m., and 4:35 a.m. on December 11, 2011.

Several days later, Long went to visit Thornburg in Sweetwater and asked him about Shields again. Long testified that Thornburg had told her that after he had persuaded Shields to come out of her house to talk, he had taken her to a field between Graham and Breckenridge and had shot her in the head. Thornburg said that Shields had tried to move after he had shot her, so he shot her again, covered her, and left.

Long testified that she had initially. lied to investigators when she was questioned about Shields's . disappearance because she had been scared of Thornburg. Long said that she had entered a plea of guilty to Shields's murder as a co-conspirator in exchange for a thirty-year prison sentence.

### E. Testimony from Other Individuals

#### 1. Lychelle Doolittle

Thornburg's mother, Lychelle Doolittle, testified that Thornburg was living with her in Sweetwater when Shields disappeared. She said that around the time of Shields's disappearance, she entered her car to go to church and discovered that the car's gas tank was empty even though she had filled it with gas the day before. Doolittle said that Thornburg did not seem very concerned about Shields's disappearance. Doolittle testified that when she heard that Shields was missing, she "had thoughts" that her son might have had something to do with her disappearance. Doolittle said, "[O]nce [Thornburg] quit talking to [Shields] over the phone and the gas situation and the attitude behind everything, it hit me in the face that he very well could have been a part of it, . . . ."

12

## 2. Steve Brown

Steve Brown, who was partying on the night of December 10 with Long and some of her friends in Cortez's mobile home in Graham, testified that Long had received a phone call from Thornburg late that night and that she had started out of the house. Brown asked Long what she was doing, and Long answered that she was taking some bleach to Thornburg. Brown testified that Long had grabbed a container of bleach and that he had followed her. When Brown saw that Thornburg was in the driveway, Brown went back inside. When Long came back inside, she no longer had the bleach with her.

## 3. Jessica Cortez

Jessica Cortez, who owned the mobile home where Long was living in December 2011, testified that she questioned Long when she discovered that the household's bleach was gone. Cortez testified that Long had told her that she had given the bleach to Thornburg because he had killed Shields.

## 4. **Timothy Thornburg**

Thornburg's half-brother Timothy testified that Thornburg had come to his house about five months before Thornburg was arrested and had told Timothy what he had done to Shields. Timothy said that Thornburg had described the killing in detail, including telling him the pretense Thornburg said that he had used to lure Shields out into a field; Thornburg said that he was taking Shields to a place where he and Timothy used to build clubhouses when they were children. Thornburg told him that he had shot Shields in the back of the head but

13

that she was not quite dead, so he shot her a few more times and then poured bleach over her body. Timothy testified that Thornburg had told him that he had killed Shields because she was a "lying, cheatin' skank."

## F. Outcome

After hearing the above evidence, the jury convicted Thornburg of the offense of murder as charged in the indictment and assessed his punishment at life imprisonment. The trial court sentenced Thornburg to life imprisonment, and this appeal followed.

## III. SUFFICIENCY OF THE EVIDENCE

In his second issue, Thornburg argues that the evidence is insufficient because his extrajudicial confessions to his brother, Santiago, and Long were not corroborated by independent evidence tending to establish the corpus delicti of murder. In his first issue, Thornburg argues that the evidence is insufficient to prove that he caused Shields's death by shooting her with a firearm because her body has never been found and the gun that was recovered by police was not shown to have been used in the commission of a crime. We will address each of these sufficiency issues in turn below.

## A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443   U.S.

14

307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State,* 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.,* 99 S. Ct. at 2789; *Dobbs,* 434 S.W.3d at 170.

## 8. Applicable Law

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2011). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

The corpus delicti rule states that, "[w]hen the burden of proof is 'beyond a reasonable doubt,' a defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt absent independent evidence of the corpus delicti." *Miller v. State,* 457 S.W.3d 919, 924 (Tex. Crim. App. 2015) (quoting *Hacker v. State,* 389 S.W.3d 860, 865 (Tex. Crim. App. 2013)). To satisfy the corpus-delicti rule, there must be "evidence independent of a defendant's extrajudicial confession show[ing] that the 'essential nature' of the charged crime was committed by someone." *Id.* (quoting *Hacker,* 389 S.W.3d at 866).

15

The corpus delicti of murder is established if the evidence shows (1) the death of a human being (2) caused by the criminal act of another. *See Fisher v. State,* 851 S.W.2d 298, 302 (Tex. Crim. App. 1993). The corroborating evidence need not conclusively prove the underlying offense; rather, "[a]ll that is required is that there be some evidence which renders the commission of the offense more probable than it would be without the evidence." *Cardenas v. State,* 30 S.W.3d 384, 390 (Tex. Crim. App. 2000) (quoting *Chambers v. State* 866 S.W.2d 9, 15 (Tex. Crim. App. 1993), *cert. denied,* 511 U.S. 1100 (1994)); *Gribble v. State,* 808 S.W.2d 65, 71-72 (Tex. Crim. App. 1990) ("[T]he quantum of independent evidence necessary to corroborate the corpus delicti in a criminal prosecution relying upon the extrajudicial confession of an accused need not be great."), *cert. denied,* 501 U.S. 1232 (1991). The State may prove the corpus delicti by circumstantial evidence. *See McDuff v. State,* 939 S.W.2d 607, 614 (Tex. Crim. App.), *cert. denied,* 522 U.S. 844 (1997). "[P]roduction and identification of the victim's body or remains is not part of the corpus delicti of murder." *Fisher ,* 851 S.W.2d at 303.

## C. Analysis of Sufficiency Complaints

Here, we begin by examining the sufficiency of the evidence to support the corpus delicti of murder. Excluding Thornburg's extrajudicial confessions, the record demonstrates the following:

- Shields disappeared suddenly and without a trace on December 10, 2011, and was never seen again;

16

- prior to December 10, 2011, Shields had called her mother daily, but her mother had not heard from Shields since her disappearance;

- personal items that she was never seen without-including her purse, cell phone, and make up-were left in her bedroom;

- Thornburg communicated with Shields throughout the evening of December 10, 2011, and into the early morning hours of December 11, 2011;

- the bulk of the communications between Thornburg and Shields had been deleted from Shields's cell phone;

- Thornburg's cell phone records indicated that he had traveled east from Sweetwater in the middle of the night, despite not owning a car;

- around the time of Shields's disappearance, Thornburg's mother, with whom he lived, noticed that her car's gas tank was empty despite having filled it the day prior;

o the month before Shields's disappearance, Thornburg and Long had discussed killing Shields;

- Brown saw Long give Thornburg a bottle of bleach late on the night of December 10, 2011;

- when Cortez noticed that the bleach she shared with Long was gone, she questioned Long, and Long said that she had given the bleach to Thornburg because he had killed Shields; and

17

- a gun recovered from Thornburg's apartment contained a blood stain that, when tested for the presence of DNA, revealed that Shields could not be excluded as a contributor of the DNA and that the odds of a random match were one in 32.39 trillion.

Considering all the record evidence, other than Thornburg's extrajudicial confessions, in the light most favorable to the jury's verdict, we hold that the evidence tended to establish that Shields was actually murdered by someone; thus, sufficient evidence establishes the corpus delicti of murder. *See id.* at 304 (holding evidence sufficient to establish corpus delicti for murder based on facts that victim had "vanished suddenly without a trace," despite not owning a car or having sufficient money to travel; had a strained relationship with the appellant; and had left personal matters and property unattended); *Trejos* v. *State,* 243 S.W.3d 30, 56-57 (Tex. App.-Houston [1st Dist.] 2007, pet. refd) (holding evidence sufficient to establish corpus delicti for murder based on facts that victim had disappeared suddenly and ·without explanation and had never resurfaced, that forensic tests had revealed the "possible presence of blood" in her home, and that the Bible she always carried with her was found in her home); *Jaggers* v. *State,* 125 S.W.3d 661, 668-69 (Tex. App.-Houston [1st Dist.] 2003, pet. refd) (holding evidence sufficient to establish corpus delicti for murder based on facts that victim had disappeared without informing friends or family, that victim's car was inoperable, **that** she was without sufficient funds to travel, and that she had stopped calling her daughter on her daughter's birthdays and on

18

holidays as she had consistently done in the past). We overrule Thornburg's second issue.

Next, we look at the record as a whole to determine the sufficiency of the evidence to support Thornburg's murder conviction. Here, Thornburg's extrajudicial confessions to Santiago, Long, and his brother Timothy are sufficient-without any additional evidence-to warrant a rational finding of Thornburg's guilt of all the elements of murder beyond a reasonable doubt. *See Fisher,* 851 S.W.2d at 304 (stating that "[the witness's] testimony regarding appellant's oral confession was by itself sufficient evidence to warrant a rational finding of appellant's guilt of all the elements of the offense beyond a reasonable doubt."). Thornburg's arguments-that the gun recovered by police was not shown to have been used in the commission of a crime and that Shields's body was never recovered-do not render the evidence insufficient because the State is not required to prove the specific murder weapon or to locate the victim's body in order to obtain a conviction for murder. *See* Tex. Penal Code Ann. § 19.02(b)(1) (setting forth elements of murder); *Fisher v. State,* 827 S.W.2d 597, 601 (Tex. App.-San Antonio 1992) ("[I]n a prosecution for murder, the State can prove all the elements of the offense by way of circumstantial evidence and need not produce and identify the body of the deceased."), *aff'd,* 851 S.W.2d 298 (Tex. Crim. App. 1993); *Tijerino v. State,* No. 14-06-01012-CR, 2008 WL 509880, at *3 (Tex. App.- Houston [14th Dist.) Feb. 26, 2008, no pet.) (mem. op., not designated for publication) ("[T]he State need not offer a murder weapon into

19

evidence to establish the essential elements of murder."). Thus, viewing all of the evidence- including Thornburg's extrajudicial confessions-in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Thornburg intentionally or knowingly caused the death of Shields by shooting her with a firearm. *See Jackson,* 443 U.S. at 326, 99 S. Ct. at 2793 (applying standard of review and holding evidence sufficient to support conviction for murder by shooting victim). We overrule Thornburg's first issue.

## IV. MOTION TO SUPPRESS

In his third issue, Thornburg argues that the trial court erred by denying his motion to suppress the handgun seized by Detective Richburg because neither the plain-view doctrine nor exigent circumstances justified the warrantless search of his home and the resulting seizure of the handgun. The State argues that this argument does not comport with Thornburg's argument at the trial level.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Everitt v. State,* 407 S.W.3d 259, 262-63 (Tex. Crim. App. 2013); *Sanchez v. State,* 418 S.W.3d 302, 306 (Tex. App.-Fort Worth 2013, pet. ref'd). In raising the complaint on appeal, the party must ensure that the complaint is the same as the complaint or objection made during trial. *Wilson v. State,* 71 S.W.3d 346, 349 (Tex. Crim. App. 2002);

20

*Turner v. State,* 805 S.W.2d 423, 431 (Tex. Crim. App.), *cert. denied,* 502 U.S. 870 (1991). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Ford v. State,* 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

Here, Thornburg's motion to suppress focused solely on the consent exception to the warrant requirement7 and argued that his failure to object to the search of his apartment was due to the officers' deception in hiding the fact that a search would occur. At the hearing on Thornburg's motion to suppress, he testified that he had objected to the officers' search. He now argues on appeal for the first time that the trial court erred by denying his motion to suppress because neither the plain-view doctrine nor exigent circumstances justified the warrantless search of his home and the resulting seizure of the handgun.

Because Thornburg's motion to suppress and his argument at the suppression hearing centered on whether there was consent to search his apartment, he forfeited his complaint on appeal that the search was not justified by other exceptions to the warrant requirement, such as the plain-view doctrine and exigent circumstances. *See Wilson,* 71 S.W.3d at 349; *Jones v. State,* No. 02-12-00360-CR, 2014 WL 3953788, at *2-3 (Tex. App.-Fort Worth Aug. 14, 2014, no pet.) (mem. op., not designated for publication) (holding that appellant

---

. 7Thornburg's motion initially states that "no exception permitting a warrantless search appl[ies] under the facts." Two pages later, the motion lists six exceptions to the warrant requirement and states, "Here, the only exception that might apply is the consent exception, . . . ."

forfeited his complaint on appeal because his appellate argument did not comport with the arguments he had raised in his motion to suppress). We overrule Thornburg's third issue.

V. TRIAL COURT'S DECISION TO ADMIT EXPERT TESTIMONY WAS HARMLESS

In his fourth issue, Thornburg argues that the trial court abused its discretion by admitting testimony regarding an expert's opinion as to whether he had located blood on Thornburg's gun.

We need not determine whether the trial court erred by admitting the forensic scientist's testimony regarding whether Shields's DNA was present in the stain found on the gun because even assuming that it was error, we hold that any error was harmless. As to harm, rule of appellate procedure 44.2(b) provides that any error, other than constitutional error, that does not affect the defendant's substantial rights must be disregarded. Tex. R. App. P. 44.2(b); *see, e.g., Coble v. State,* 330 S.W.3d 253, 280 (Tex. Crim. App. 2010) (holding that a violation of the evidentiary rules that results in the erroneous admission of evidence is nonconstitutional error), *cert. denied,* 131 S. Ct. 3030 (2011). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but

22

a slight effect." *Solomon v. State,* 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State,* 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motil/a v. State,* 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355-56.

Here, we have already reviewed the record as a whole in our sufficiency analysis. As detailed above, even excluding the forensic scientist's testimony, there is overwhelming evidence of Thornburg's guilt. The jury had before it Thornburg's extrajudicial confessions, along with the recording of the telephone call from Santiago to Thornburg in which he stated, "I killed [Shields] because of me-she was going to make it so I couldn't see my daughter . . . ," and that he would not get away with killing both Santiago and Shields. The jury charge did not specifically mention the gun but instead instructed the jurors to consider the testimony and exhibits to reach their decision. And although the State mentioned the DNA evidence during its closing argument, it did not emphasize it but instead recapped all of the evidence that was presented.

We conclude that, in the context of the entire case against Thornburg, the trial court's error, if any, in admitting the testimony in question did not have a substantial or injurious effect on the jury's verdict and did not affect Thornburg's substantial rights. *See King,* 953 S.W.2d at 273; *see also Neal v. Stale,* 256 S.W.3d 264, 285 (Tex. Crim. App. 2008) (assuming without deciding that trial court erred by admitting surveillance videotapes and ATM receipts and holding that such error was harmless in light of the overwhelming evidence of guilt), *cert. denied,* 555 U.S. 1154 (2009). Thus, we disregard the error. *See* Tex. R. App. P. 44.2(b). We overrule Thornburg's fourth issue.

## VI. CONCLUSION

Having overruled Thornburg's four issues, we affirm the trial court's judgment. ·

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 6, 2015

Print this page

# Envelope 6815816

## Case Information

| | |
|---|---|
| Location | Court Of Criminal Appeals |
| Date Filed | 09/07/2015 08:38:57 PM |
| Case Number | |
| Case Description | |
| Assigned to Judge | |
| Attorney | Tim Copeland |
| Firm Name | Copeland Law Firm |
| Filed By | Tim Copeland |
| Filer Type | Not Applicable |

## Fees

| | |
|---|---|
| Convenience Fee | $0.09 |
| Total Court Case Fees | $0.00 |
| Total Court Filing Fees | $0.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $2.99 |
| Total Provider Tax Fees | $0.25 |
| Grand Total | $3.33 |

## Payment

| | |
|---|---|
| Account Name | Wells Fargo |
| Transaction Amount | $3.33 |
| Transaction Response | |
| Transaction ID | 11166748 |
| Order # | 006815816-0 |

## Petition for Discretionary Review

| | |
|---|---|
| Filing Type | EFile |
| Filing Code | Petition for Discretionary Review |
| Filing Description | Petition for Discretionary Review |
| Reference Number | 770391 |
| Comments | |
| Status | Rejected |

## Fees

| | |
|---|---|
| Court Fee | $0.00 |
| Service Fee | $0.00 |

## Rejection Information

| Rejection Reason | Time | Rejection Comment |
|---|---|---|
| Other | 09/14/2015 09:22:11 | The document has the wrong trial court case number as well as the wrong court of appeals cause number on the front cover. You have ten days to tender a corrected |

AM          petition for discretionary review.

**Documents**

*Lead Document*          Final 9-07 Star (W).pdf                    [Original]